No. 24-3863

_____

IN THE UNITED STATES COURT OF APEALS
FOR THE SIXTH CIRCUIT

_____

CHRISTINA HENRY,

*Plaintiff-Appellant,*

v.

SOUTHERN OHIO MEDICAL CENTER,

*Defendant-Appellee.*
_____

On Appeal from the United States District Court
for the Southern District of Ohio
Case No. 1:22-cv-00679

_____

**BRIEF OF DEFENDANT-APPELLEE
SOUTHERN OHIO MEDICAL CENTER**

_____

S. Mark Klyza (OH Bar #27186)
Benjamin Landau-Beispiel (La. Bar No. 40426)
**THE KULLMAN FIRM, P.L.C.**
1100 Poydras Street, Suite 1600
New Orleans, LA 70163
Telephone: (504) 524-4162
Facsimile: (504) 596-4114
E-mail: smk@kullmanlaw.com
E-mail: blb@kullmanlaw.com

*Attorneys for Defendant-Appellee
Southern Ohio Medical Center*

**CORPORATE DISCLOSURE STATEMENT OF DEFENDANT-APPELLEE
SOUTHERN OHIO MEDICAL CENTER**


Pursuant to FRAP 26.1 and 6 Cir. R. 26.1, Defendant-Appellee Southern Ohio

Medical Center makes the following disclosures:


1.     Is said party a subsidiary or affiliate of a publicly owned corporation?
       If yes, list below the identity of the parent corporation or affiliate and
       the relationship between it and the named party:

       No.

2.     Is there a publicly owned corporation, not a party to the appeal, that has
       a financial interest in the outcome? If yes, list the identity of such
       corporation and the nature of the financial interest:

       No.


/s/ *S. Mark Klyza*_____
S. Mark Klyza

## **TABLE OF CONTENTS**

STATEMENT REGARDING ORAL ARGUMENT...................................................1

STATEMENT OF THE ISSUES ................................................................2

INTRODUCTION ....................................................................................3

STATEMENT OF THE CASE....................................................................7

I.    Factual Background .........................................................................7

      A.    SOMC follows the highest standards for patient care.........................7

      B.    SOMC developed scientifically validated policies and
            procedures to protect patients during the COVID-19 pandemic. .........8

      C.    Henry sought to avoid vaccination, testing, and masking. .................12

      D.    SOMC reviewed Henry's requests but ultimately placed
            her on leave due to her refusal to undergo weekly COVID-19
            testing – and then invited her back.....................................................15

II.   Procedural History .........................................................................19

SUMMARY OF THE ARGUMENT ....................................................19

ARGUMENT .......................................................................................21

I.    The district court correctly dismissed Henry's Title VII failure-to-
      accommodate claim. ....................................................................21

      A.    Henry has forfeited her right to appeal the district court's
            holding that her request to be exempted from all COVID-19
            testing would have imposed an undue hardship on SOMC. ..............22

      B.    Because she did not hold a sincere religious belief that
            conflicted with SOMC's COVID-19 testing requirement,
            Henry failed to establish the first element of a prima facie
            case of religious discrimination...........................................................23

            1.    Henry's purportedly religious beliefs do not conflict with
                  SOMC's requirement to undergo weekly nasopharyngeal
                  testing. ......................................................................................24

2.    The beliefs that motivated Henry to object to COVID-19 testing are not religious in nature..............................................27

C.    Because she did not adequately inform SOMC of the conflict between her alleged beliefs and the COVID-19 testing requirement, Henry failed to establish the second element of a prima facie case of religious discrimination. ......................................33

1.    Henry's testimony that she inquired about less invasive forms of testing does not create a genuine issue of material fact..............................................................................36

D.    Additionally, Henry's claim fails because she failed to participate in good faith in the interactive process. ...............................40

E.    The district court correctly held that SOMC would have faced an undue hardship in offering Henry saliva testing. ...........................43

1.    The scope of this Court's review is limited because Henry did not respond to SOMC's argument that saliva testing would impose an undue hardship in her Opposition to SOMC's Motion for Summary Judgment............................45

2.    SOMC would have faced an undue hardship in offering Henry saliva testing..................................................................46

II.    The district court correctly dismissed Henry's Title VII retaliation claim....53

CONCLUSION ..........................................................................................54

CERTIFICATE OF COMPLIANCE ......................................................56

CERTIFICATE OF SERVICE ..................................................................57

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ...............58

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Adams v. Mass Gen. Brigham, Inc.*,
   No. 21-11686-FDS, 2023 WL 6318821 (D. Mass. Sept. 28, 2023) ....................47

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 251-52 (1986) ...............................................................................38

*Averett v. Honda of Am. Mfg., Inc.*,
   No. 2:07-CV-1167, 2010 WL 522826 (S.D. Ohio Feb. 9, 2010) ........................33

*Blackwell v. Lehigh Valley Health Network*,
   No. 5:22-CV-03360-JMG, 2023 WL 5807840 (E.D. Pa. Sept. 7, 2023) ...... 31, 34

*Bobnar v. AstraZeneca Pharms. LP*,
   No. 1:22-CV-2258, 2024 WL 4893911 (N.D. Ohio Nov. 26, 2024) ....................24

*Boykin v. Fam. Dollar Stores of Michigan, LLC*,
   3 F.4th 832, 842 (6th Cir. 2021) .........................................................................38

*Brokken v. Hennepin Cnty.*,
   No. CV 23-1469 (JRT/DJF), 2024 WL 1382150 (D. Minn. Mar. 29, 2024) .......51

*Callahan v. Woods*,
   658 F.2d 679, 684 (9th Cir. 1981) .......................................................................32

*Chinnery v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*,
   No. 1:23CV1110 (DJN), 2024 WL 3152348 (E.D. Va. June 24, 2024) ..............25

*Clark Cnty. Sch. Dist. v. Breeden*,
   532 U.S. 268, 272 (2001) ....................................................................................54

*Detwiler v. Mid-Columbia Med. Ctr.*,
   Case No. 3:22-cv-01306-JR, 2023 WL 7221458 (D. Or. Sept. 13, 2023) ...........29

*DeVore v. Univ. of Kentucky Bd. of Trustees*,
   118 F.4th 839, 846 (6th Cir. 2024)......................................................................24

*Draper v. U.S. Pipe & Foundry Co.*,
   527 F.2d 515, 521 (6th Cir. 1975) .......................................................................43

*E.E.O.C. v. Univ. of Detroit*,
    904 F.2d 331, 335 (6th Cir. 1990) .........................................................................33

*Ellison v. Inova Health Care Servs.*,
    730 F. Supp. 3d 221, 231–32 (E.D. Va. 2024) ............................................... 24, 26

*Geerlings v. Tredyffrin/Easttown School District*,
    Civ. A. No. 21-4024, 2021 WL 4399672 (E.D. Pa. Sep. 27, 2021) ....................29

*Golden v. Mirabile Inv. Corp.*,
    724 F. App'x 441, 445 (6th Cir. 2018) ..................................................................49

*Groff v. DeJoy*,
    600 U.S. 447, 473 (2023) ............................................................................... 42, 43

*Holt v. Hobbs*,
    574 U.S. 352, 360–61, (2015) ..............................................................................28

*Hurley v. Varian Med. Sys.*,
    No. 23-CV-42, 2024 WL 2368438 (E.D. Wis. May 23, 2024)..............................29

*Jiglov v. Hotel Peabody*,
    G.P., 719 F. Supp. 2d 918, 930–31 (W.D. Tenn. 2010) ................................. 33, 34

*Kizer v. St. Jude Children's Rsch. Hosp.* ("*Kizer II*"),
    No. 24-5207, 2024 WL 4816856 (6th Cir. Nov. 18, 2024) .......................... passim

*Kizer v. St. Jude Children's Rsch. Hosp., Inc.* ("*Kizer I*"),
    No. 2:22-CV-02620-TLP-CGC, 2024 WL 4834056 (W.D. Tenn. Feb. 9, 2024) .50

*Kleiber v. Honda of Am. Mfg., Inc.*,
    485 F.3d 862, 871 (6th Cir. 2007) ........................................................................40

*Kovac v. Superior Dairy, Inc.*,
    998 F. Supp. 2d 609, 619–20 (N.D. Ohio 2014) ............................................ 41, 42

*Kuhn v. Washtenaw Cnty.*,
    709 F.3d 612, 624 (6th Cir. 2013) ........................................................................23

*Laughlin v. City of Cleveland*,
    633 F. App'x 312, 315 (6th Cir. 2015) (emphasis added)....................................53

*Loc. No. 499, Bd. of Trustees of Shopmen's Pension Plan v. Art Iron, Inc.*,
   117 F.4th 923, 934 (6th Cir. 2024) ................................................................. 46, 51

*Lucky v. Landmark Med. of Michigan, P.C.*,
   103 F.4th 124 (6th Cir. 2024) ................................................................. 31

*MacDonald v. Oregon Health & Science Univ.*,
   No. 3:22-cv-01942-IM, 2024 WL 3316199 (D. Or. July 5, 2024), *appeal
   docketed*, No. 24-4852 (9th Cir. Aug. 8, 2024) ....................................... 44

*McDowell v. Bayhealth Med. Ctr., Inc.*,
   No. CV 22-1392-RGA, 2024 WL 278187 (D. Del. Jan. 25, 2024) .................... 28

*Montell v. Diversified Clinical Servs., Inc.*,
   757 F.3d 497, 507 (6th Cir. 2014) ....................................................... 54

*Petermann v. Aspirus, Inc.*,
   No. 22-CV-332-JDP, 2023 WL 2662899 (W.D. Wis. Mar. 28, 2023) .............. 31

*Prida v. Option Care Enterprises, Inc.*,
   No. 5:23-CV-00905, 2023 WL 7003402 (N.D. Ohio Oct. 24, 2023) ............ 27, 28

*Reich v. City of Elizabethtown*,
   945 F.3d 968, 976 (6th Cir. 2019) ....................................................... 38

*Ringhofer v. Mayo Clinic, Ambulance*,
   102 F.4th 894, 901 (8th Cir. 2024) ..................................................... 32

*Savel v. MetroHealth Sys.*,
   No. 1:22-CV-02154, 2024 WL 4581542 (N.D. Ohio Oct. 25, 2024) ............... 43

*Sheet Metal Workers' Health & Welfare Fund of N. Carolina v. L. Off. of Michael
   A. DeMayo, LLP*,
   21 F.4th 350, 355 (6th Cir. 2021) ....................................................... 45

*Smith v. Chrysler Corp.*,
   155 F.3d 799, 807 (6th Cir. 1998) ....................................................... 43

*Sturgill v. Am. Red Cross*,
   114 F.4th 803 (6th Cir. 2024) ............................................................. 31, 32

*Stynchula v. Inova Health Care Services*,
   No. 1:23-CV-01629-MSN-LRV, 2024 WL 4830578 (E.D. Va. Nov. 19, 2024) ... 26

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338, 362 (2013) ...................................................................53

*Welsh v. United States*,
  398 U.S. 333, 342–43 (1970) ..............................................................28

*Williams v. William Beaumont Hosp.*,
  2007 WL 4455023 (E.D. Mich. 2007).................................................54

*Wise v. Children's Hosp. Med. Ctr. of Akron,*
  No. 5:22-CV-02092, 2024 WL 3345494 (N.D. Ohio July 9, 2024)........ 47, 50, 52

**Statutes**

Americans with Disabilities Act ("ADA")
  U.S. Code, Title 42 ................................................................... 19, 40, 41

Title VII of the Civil Rights Act of 1964 ("Title VII")
  42 U.S. Code § 2000e.................................................................. passim

**Other Authorities**

Fed. R. App. P. 25(c) ...............................................................................57

Fed. R. App. P. 26.1................................................................................. ii

Fed. R. App. P. 32(a)(5) ..........................................................................56

Fed. R. App. P. 32(a)(6) ..........................................................................56

Fed. R. App. P. 32(f)................................................................................56

Fed. R. App. P. 34(a)(2) ............................................................................1

Fed. R. Evid. 702 ....................................................................................25

Sixth Circuit Rule 25(f)(1).......................................................................57

Sixth Circuit Rule 26.1 ............................................................................ ii

Sixth Circuit Rule 28(b)(1)(A)(i).............................................................58

Sixth Circuit Rule 30(g)(1) ......................................................................58

Sixth Circuit Rule 32(b)(1) ......................................................................56

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee Southern Ohio Medical Center believes that oral argument is not necessary because the facts and legal arguments are adequately presented in the briefs and record. *See* Fed. R. App. P. 34(a)(2).

## STATEMENT OF THE ISSUES

1.      Whether SOMC is entitled to summary judgment on Henry's failure-to-accommodate claim under Title VII of the Civil Rights Act of 1964 ("Title VII") because Henry cannot establish a prima facie case.

2.      Whether SOMC is entitled to summary judgment on Henry's Title VII failure-to-accommodate claim because Henry failed to participate in good faith in the interactive process.

3.      Whether the district court was correct in holding that SOMC is entitled to summary judgment on its affirmative defense to Henry's Title VII failure-to-accommodate claim that it would have faced an undue hardship in offering Henry saliva testing.

4.      Whether the district court was correct in holding that SOMC is entitled to summary judgment on Henry's Title VII retaliation claim because she cannot establish causation.

## INTRODUCTION

In September 2021, Defendant Southern Ohio Medical Center ("SOMC") implemented a COVID-19 vaccination requirement to protect its patients and staff from the then-ongoing pandemic.[1] Plaintiff Christina Henry ("Henry") – a nurse who worked in the pediatric unit of SOMC's hospital and had regular, direct contact with patients, including newborns[2] – opposed the requirement and submitted a letter requesting "to abstain from covid testing and vaccines because these are violations of my sincerely held religious beliefs."[3] In particular, she stated that, because she considered COVID-19 vaccination and testing to be unsafe, they violated her belief that her "body is the temple of the Holy Spirit."[4] SOMC offered to accommodate Henry with weekly COVID-19 testing in lieu of vaccination, but it was unable to accommodate her request to "self-screen" – that is, to "stay home if I'm sick"[5] – in lieu of weekly testing.[6] Henry was subsequently placed on unpaid leave until SOMC lifted its testing requirement and then invited to return to work, which she declined.[7]

During her employment with SOMC, Henry never expressed that her purported religious objection applied only to nasopharyngeal testing but not to other,

---

[1] Blankenship Decl. at ¶ 22, R. 21-3, PageID #255.
[2] *Id.* at ¶ 29; Henry Dep. at 16:13-16, R. 21-4, PageID #289.
[3] Henry Letter 9/3/21, R. 21-3, PageID #263.
[4] *Id.*
[5] Henry Dep. at 49:10-15, R. 21-4, PageID #322.
[6] Applegate Decl. at ¶ 22-25, R. 21-7, PageID #434.
[7] *Id.* at ¶ 32-35, R. 21-7, PageID #435.

similarly invasive forms of COVID-19 testing – despite submitting three lengthy religious accommodation letters.[8] Even at the outset of this litigation on November 17, 2022, Henry's Complaint made no distinction between different types of COVID-19 tests and simply stated that "Plaintiff holds sincere religious beliefs that prevent her from receiving either a COVID-19 vaccine or conducting weekly COVID-19 testing."[9]

But Henry understands that it is more difficult to hit a moving target. During her deposition on August 11, 2023, Henry stated for the first time that her objection was not to all COVID-19 testing and that she would have been willing to take a saliva test.[10] Then, on October 27, 2023, Henry designated an expert witness to testify regarding the availability and accuracy of saliva testing.[11] SOMC, surprised by Henry's belated assertion of her entitlement to saliva testing, painstakingly explained in its February 15, 2024 Motion for Summary Judgment that such testing was not offered to any employee and could not have been offered to Henry without an undue hardship.[12]

---

[8] *See* Henry Letter 9/3/21, R. 21-3, PageID #263-66; Hall Letter in Support of Henry, R. 21-3, PageID #271-72; Henry Letter 9/14/21, R. 21-3, PageID #273.
[9] Complaint at ¶ 37, R. 1, PageID #7.
[10] Henry Dep. at 53:6-13, R. 21-4, PageID #326.
[11] Plaintiff's Rebuttal Expert Witness Designation, R. 13-3, PageID #77-78. Note that Plaintiff's expert did not satisfy the requirements for being classified as a rebuttal witness. *See* Defendant's Memorandum in Support of Its Motion to Exclude Plaintiff's Expert Witness, Dr. Heinz J. Huber, Phd., R. 13-1, PageID# 56-67.
[12] Defendant's Memorandum in Support of Its Motion for Summary Judgment, R. 21-1, PageID #180-86.

Henry responded by moving the target yet again. In her Opposition to SOMC's Motion for Summary Judgment, filed on March 21, 2024, Henry completely ignored SOMC's argument that offering saliva testing would have imposed an undue hardship.[13] Instead, Henry filed an affidavit stating for the first time that her request to SOMC "to abstain from covid testing" had supposedly applied *only* to nasopharyngeal testing – and for a reason that she had never previously disclosed: "the nasopharyngeal test could potentially break the blood-brain barrier."[14]  In her affidavit, Henry went on to assert for the first time that she would have accepted oropharyngeal testing, because "it would have zeroed the chance of breaking the blood-brain barrier," or anterior nares testing, because "the swab is not pushed as far into the nasal passage."[15] Again, SOMC was surprised: during Henry's employment, she had expressly stated that her religious beliefs precluded oropharyngeal testing[16] and tests involving "a foreign body being inserted into my nasal passages,"[17] e.g., anterior nares testing.

The district court granted summary judgment for SOMC on September 9, 2024, holding that SOMC had met its burden to show that both saliva testing and exemption from all testing – the only accommodations potentially at issue – would

---

[13] Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, R. 25, PageID #613-32.
[14] Henry Aff. at ¶ 4, R. 25-1, PageID #633.
[15] *Id.* at ¶ 9, PageID #634.
[16] Bryan Presentation, R. 21-13, PageID #594; Henry Dep. at 48:9-14, R. 21-4, PageID #321.
[17] Henry Letter 9/3/21, R. 21-3, PageID #263.

have imposed an undue hardship.[18] Pushing onward with her new theory that SOMC should have offered her oropharyngeal or anterior nares testing, Henry has filed this appeal. But throughout this litigation, Henry has never argued that SOMC was obligated to offer her the only accommodation that she actually requested during her employment: to abstain from all COVID-19 testing and to "self-screen." Instead, Henry has repeatedly attempted to retroactively revise her objection based on no evidence but her own self-serving statements made during litigation. In so doing, she has created a record that fatally undermines her case.

The survival of Henry's claim now depends on this Court's willingness to issue at least two of the following three holdings, any one of which would be sufficient to sow chaos in the legal regime governing Title VII accommodations:

(1) That if an employee declares that protecting her health is a matter of religious significance, an employer is obligated to accommodate all her beliefs about what is harmful to her health – up to and including her beliefs regarding the relative dangers of various methods of collecting culture samples to diagnose respiratory infections, regardless of whether such beliefs are supported by admissible evidence;

(2) That an employer may be held liable for its failure to offer religious accommodations that an employee never proposed until after commencing

---

[18] Order and Opinion, R. 32, PageID #714-30.

6

litigation and that conflict with the employee's avowed religious beliefs as expressed during her employment; and

(3) That a hospital must bear an increased risk of exposing its patients and staff to infection during a pandemic for the purpose of accommodating an employee's belief in medical misinformation that she discovered online.

Because such holdings are just as absurd as they are essential to Henry's claim, and for additional reasons elaborated below, this Court should affirm the district court's Order granting SOMC's Motion for Summary Judgment.

## STATEMENT OF THE CASE

### I.     Factual Background

#### A.     SOMC follows the highest standards for patient care.

SOMC is a 211-bed 501(C)(3) not-for-profit hospital in Portsmouth, Ohio, providing emergency and surgical care, as well as a wide range of other health-care services. Applegate Decl. at ¶ 3, R. 21-7, PageID #431. SOMC employs over 3,000 full- and part-time employees, has a medical staff of more than 250 physicians and specialists, and is supported by hundreds of volunteers. *Id.* at ¶ 4. The operation of SOMC follows guidelines of The Joint Commission, the nation's predominant standards-setting body in health care, and SOMC has received top honors from that organization for meeting standards. *Id.* at ¶ 5, PageID # 432.

**B.    SOMC developed scientifically validated policies and procedures to protect patients during the COVID-19 pandemic.**

When the unprecedented COVID-19 pandemic began in the first quarter of 2020, SOMC implemented protocols to meet its obligation to provide a safe environment for its patients and employees while still fulfilling its critical functions as a hospital. *Id.* at ¶¶ 6-7. Such protocols were based on the most current guidance of the Centers for Disease Control ("CDC") and were updated as such guidance was updated. Blankenship Decl. at ¶ 10, R. 21-3, PageID #253.

SOMC's protocols included a requirement that any employee who reported symptoms or had a high risk of exposure obtain a negative COVID-19 test before returning to work. *Id.* However, at the outset of the pandemic, SOMC lacked the capacity to analyze such tests internally; rather, it had to send them to a third-party lab and wait three to seven days for results. *Id.* at ¶ 11; Profitt Decl. at ¶¶ 3-4, R. 21-9, PageID #458. This wait resulted in serious staffing shortages that, in turn, negatively impacted SOMC's ability to provide patient care at a time when the hospital was already strained with COVID-19 patients. Blankenship Decl. at ¶ 13, R. 21-3, PageID #254. The wait also limited SOMC's ability to adequately manage or isolate patients who were potentially infected. Cassity Decl. at ¶ 4, R. 21-10, PageID #461.

To meet this challenge, SOMC began validating its own in-house process of analyzing COVID-19 tests. *Id.* at ¶¶ 3-4, PageID #460-61. In the development

process, one consideration was the type of culture sample and/or collection method that SOMC's in-house testing process would utilize. *Id.* at ¶¶ 5-18, PageID #461-64. Among the options were nasopharyngeal testing, which uses a swab to collect a sample from approximately three centimeters inside the nasal cavity; oropharyngeal testing, which uses a swab to collect a sample from the middle part of the throat; anterior nares testing, which uses a swab to collect a sample from just inside the nostrils; and saliva testing, in which samples are collected by spitting into a tube. *Id.* at ¶¶ 5-9, PageID #461.[19] SOMC chose to utilize nasopharyngeal testing for several reasons, including that nasopharyngeal testing was approved as a preferred method of testing by the CDC and other medical authorities. *Id.* at ¶¶ 5-14, PageID #461-62. SOMC also utilized anterior nares and oropharyngeal testing for some individuals who required alternative collection methods. *Id.* at ¶ 6, PageID #461. Although saliva testing was considered, it was ultimately rejected because SOMC physicians had objected to such testing, and both the CDC and the American Society for Microbiology had recognized nasopharyngeal testing as the more effective testing method over saliva testing. *Id.* at ¶¶ 8-10, PageID #461-62. By August 2021, SOMC had validated its in-house testing procedures and was able to obtain COVID-19 test results in less than 24 hours. Blankenship Decl. at ¶¶ 16-18, R. 21-3, PageID #254.

---

[19] *See also* U.S. Food & Drug Administration ("FDA"), COVID-19 Test Basics, https://www.fda.gov/consumers/consumer-updates/covid-19-test-basics (accessed 1/31/25).

As a result, SOMC was able to significantly reduce the amount of time employees were kept out of the workplace while awaiting their test results. *Id.* at ¶ 19.

Around the same time, in August 2021, SOMC announced a vaccination requirement for all employees, requiring full vaccination by September 17, 2021. *Id.* at ¶ 22, PageID #255. SOMC considered the vaccine to be the most effective way to reduce the risks of COVID-19 infection and transmission. Byers Decl. at ¶¶ 11-12, R. 21-8, PageID #442-43. Such reduction was a matter of urgency at SOMC: internal statistics of COVID-19 infection among SOMC's staff had indicated that SOMC employees were likely contracting COVID-19 at work from coworkers, and that rates of positive tests were trending upwards in unvaccinated employees compared to vaccinated employees. *Id.* at ¶¶ 9-10; Blankenship Decl. at ¶¶ 14-15, R. 21-3, PageID #254.

As it was anticipated that some members of SOMC's workforce would object to the vaccine on religious grounds, SOMC also assessed possible accommodations for such individuals. Byers Decl. at ¶ 13, R. 21-8, PageID #443. SOMC ultimately adopted the recommendation of its Senior Medical Director/Infectious Disease Specialist Dr. David Byers, M.D. ("Dr. Byers") to offer employees with medical or religious grounds for exemption the ability to submit to weekly nasopharyngeal testing in lieu of vaccination. *Id.* at ¶¶ 2, 14-18, PageID #441, 443; Blankenship Decl. at ¶ 23, R. 21-3, PageID #255. Of these employees, those who had a valid

reason why a sample could not be collected via the nose were offered oropharyngeal testing. Blankenship Decl. II at ¶ 6, R. 26-1, PageID #697; FAQ, R. 21-14, PageID #600. However, no employees were offered saliva testing, as it had not been validated in-house, was deemed to be less effective, and none of the outside laboratories with which SOMC had preexisting relationships accepted saliva tests. *Id.*; Cassity Decl. at ¶¶ 4, 8-14, R. 21-10, PageID #461-62.

On August 16, 2021, SOMC's Vice President of Human Resources and Organization Development, Vicki Noel ("Noel"), sent an email to all SOMC employees with the subject "*Updated FAQ* - COVID-19 Vaccination Requirement," designated as "High" importance. Noel Email 8/16/21, R. 26-2, PageID #699. The email attached a document entitled "COVID-19 Vaccination Requirement: Frequently Asked Questions" (the "FAQ") and, in its body, instructed recipients to "Please carefully review this updated FAQ and let me know if you have any clarifying questions." *Id.*

The FAQ explained that employees could apply for exemptions from the vaccination requirement, including religious exemptions, and that employees who were granted such exemptions were required to submit to weekly nasopharyngeal testing – or oropharyngeal testing, for employees requiring an alternative collection method. FAQ, R. 21-14, PageID #600. The FAQ also answered affirmatively the question of whether "the swabs used for the specimen collection in a nasopharyngeal

test [are] safe," detailing the swab sterilization process. *Id.* Also of note, the FAQ explained that SOMC would follow the CDC's recommendation that fully vaccinated employees with no COVID-19-like symptoms and no known exposure would be exempted from the weekly screening requirement – although it stated that this decision could be reconsidered based on supply and capacity after testing higher priority individuals. *Id.* at PageID #601.

All told, SOMC received approximately 300 requests for religious exemption from the vaccine. Blankenship Decl. at ¶ 26, R. 21-3, PageID #255. Of these approximately 300 employees, all agreed to weekly testing except for Henry and one other nurse.[20] *Id.* at ¶ 28. SOMC granted all the requests for religious exemption from vaccination that it received, including Henry's, but it did not grant any religious exemptions from testing. Blankenship Dep. at 10:2-11, R. 21-11, PageID #486.

## C.    Henry sought to avoid vaccination, testing, and masking.

Henry was a Licensed Practical Nurse in SOMC's Pediatric Medical Office and had regular, direct contact with patients, including newborns. Blankenship Decl. at ¶ 29, 21-3, PageID #255; Henry Dep. at 16:13-16, R. 21-4, PageID #289. Henry received and reviewed Noel's email containing the FAQ on August 16, 2021. Henry Dep. at 20:18-25, R. 21-4, PageID #293.[21]  On September 3, 2021, Henry submitted

---

[20] The other nurse seeking exemption from weekly testing resigned prior to the processing of her request. *Id.* at ¶ 28.

[21] Appellant's Brief implies that although Henry reviewed the email, she did not also review the FAQ that was attached to that email. Appellant's Brief at p. 45. If true, Henry disregarded Noel's

a letter stating her purportedly religious opposition to COVID-19 vaccination, testing, and masking, accompanied by a second letter in support of her objections by Pastor David W. Hall ("Hall") of True Hope Ministry, which Henry had purchased on the Internet for approximately $200. *See* Henry Letter 9/3/21, R. 21-3, PageID #263-66; Hall Letter in Support of Henry, R. 21-3, PageID #271-72; Henry Dep. at 25:16-21, R. 21-4, PageID #298.

Henry began her letter by clearly stating her purpose: "I am writing to request a religious exemption from covering my face with a mask or shield, and to abstain from covid testing and vaccines because these are violations of my sincerely held religious beliefs." Henry Letter 9/3/21, R. 21-3, PageID #263. The letter explained the basis of Henry's opposition to COVID-19 vaccination and testing as follows:

> My sincerely-held Christian beliefs DO NOT ALLOW ME to: … be assaulted by a foreign body being inserted into my nasal passages (i.e., covid test) as my body is the temple of the Holy Spirit and is to remain pure.
>
> …
>
> COVID VACCINES and COVID TESTS:
> The body is the temple of the Holy Spirit and as such, should not be used for medical treatments that are unnecessary, and abhorrent. Substances in the test and the vaccine are possibly harmful to the human body, and we are called to protect the body and not participate in pharmakaia.
>
> …

---

instruction in the email to "Please carefully review this updated FAQ." *See* Noel Email 8/16/21, R. 26-2, PageID #699.

> Further, participating in a medical experiment, such as covid testing or vaccines, is also a violation of my religious beliefs. Covid tests have an emergency authorization by the FDA, not an approval. Therefore, these are experimental treatments, and I have the right to refuse to consent.

*Id.* at PageID #263-64. Hall's letter sounded the same notes. *See* Hall Letter in Support of Henry, R. 21-3, PageID #272. Neither letter made any distinction between different types of COVID-19 tests. As an accommodation, Henry requested only that she be allowed to "participate normally in all duties," i.e., that she continue to treat patients without being required be vaccinated or submit to testing. *Id.* Henry Letter 9/3/21, R. 21-3, PageID #264.

In addition to expressing her opposition to vaccination and testing, Henry's letter devoted equal space to her opposition to masking. As Henry wrote, "My sincerely held Christian beliefs DO NOT ALLOW ME to: put any type of mask, shield or covering over my face, as I am made in the image of God and I am to stand before Him with my face unveiled (2 Cor 3:18)." *Id*. at PageID #263. More specifically, Henry asserted that her wearing an N-95 mask would amount to forced participation in a Muslim religious practice: "I am a Christian. I am not a Muslim. Muslims veil their faces, not Christians. Wearing a mask is an affront my Christian beliefs." *Id*. at PageID #263-64. Henry continued that she could not be compelled to wear a mask because doing so would make her not only a Muslim but also a

prostitute: "The Bible shows us that only prostitutes and those who hide their face in shame cover their face. I am neither." *Id.* at PageID #264.

The remainder of Henry's letter consisted not of explanation of her beliefs, but rather of legal assertions – for instance that she could only be compelled to take a COVID-19 *test* (or wear a mask or receive a vaccine) upon a legal determination that she was *already* infected with COVID: "Only a court order, issued from a judge based on the sworn testimony, under penalty of perjury, from a licensed medical doctor who has examined me and has determined that I am carrying an infectious disease, could compel me or anyone to wear a mask, take a covid test or take a covid vaccine." *Id.* at PageID #265. Henry further warned that "RELIGIOUS-BASED DISCRIMINATION IS AGAINST THE LAW," and any "separate treatment" that "singles me out as unvaccinated" would "constitute[] harassment, intimidation, undue influence, coercion, and defamation." *Id.* at PageID #265-66. Henry provided no additional grounds for her opposition to COVID-19 vaccination and testing, rather asserting that "I do not need to defend my position." *Id.* at PageID #265.

**D.    SOMC reviewed Henry's requests but ultimately placed her on leave due to her refusal to undergo weekly COVID-19 testing – and then invited her back.**

Henry's letters were reviewed by Sara Blankenship ("Blankenship"), SOMC's manager of Employee Health and Wellness, who concluded that SOMC could accommodate Henry's request to avoid COVID-19 vaccination but could not

accommodate Henry's requests for exemption from masking and testing because she would pose a threat to both patients and employees if she contracted COVID-19 and was asymptomatic. Blankenship Decl. at ¶¶ 2, 30, 33, R. 21-3, PageID #252, 256. Blankenship made this determination based on her understanding of Henry's letter according to its plain language as a request to be exempted from all COVID-19 testing, not just a particular type of testing. *Id.* at ¶ 31-33. However, as Blankenship had not previously encountered an employee's refusal to test, she referred the matter to SOMC's Ethics Committee to examine whether the hospital had an ethical obligation to accommodate Henry. *Id.* at ¶ 34.

Prior to the Ethics Committee's meeting to discuss Henry's requests, on or around September 7, 2021, Henry spoke with Ethics Committee member and SOMC's Director of Social Work, Pastoral Care, and Patient Relations, Teresa Bryan ("Bryan"), who asked Henry questions to properly present her requests to the Ethics Committee. Bryan Decl. at ¶¶ 2-6, R. 21-13, PageID #592-93. During the call with Bryan, Henry explicitly stated that her religious objection applied to throat swabs (i.e., oropharyngeal testing), as is reflected in Bryan's account of the conversation, which Henry has confirmed is accurate. *Id.* at ¶ 6, PageID #593; Bryan Presentation, R. 21-13, PageID #594 ("When I prompted her on strep throat swabs, etc. She denied she would allow this."); Henry Dep. at 48:9-14, R. 21-4, PageID #321 (confirming accuracy). Further, Henry proposed only one accommodation: that SOMC should

allow her to "self-screen" – that is, to "stay home if I'm sick." Bryan Decl. at ¶ 8, R. 21-13, PageID #593; Henry Dep. at 49:10-22, R. 21-4, PageID #322. However, Henry abandoned her expressed opposition to masking and stated that she was now willing to wear a mask. Bryan Decl. at ¶ 7, R. 21-13, PageID #593.

The Ethics Committee determined on September 13, 2021, that SOMC's weekly testing requirement for unvaccinated employees was appropriate, reasonable, and ethical for a healthcare organization, and that patients' right to a safe environment outweighed Henry's right not to test. Bryan Dep. at 42:17-43:7, R. 21-12, PageID #568-69; Blankenship Decl. at ¶ 40, R. 21-3, PageID #257. The next day, September 14, 2021, SOMC's Director of HR Ken Applegate ("Applegate") and Blankenship contacted Henry via telephone, and Applegate informed Henry that she would need to submit to weekly testing or be placed on unpaid leave. *Id.* at ¶¶ 43-45, PageID #257-58; Applegate Decl. at ¶¶ 2, 24-25, R. 21-7, PageID# 431, 434. During this conversation, Henry never requested any other form of testing or inquired as to whether other forms of testing were available. Blankenship Decl. at ¶ 46, R. 21-3, PageID #258; Applegate Decl. at ¶ 26, R. 21-7, PageID# 434.

Later on September 14, 2021, Henry submitted an additional letter stating that "[t]his requirement to be fully vaccinated for Covid-19 and submit to Covid testing is something I cannot participate in because doing so would harm my soul." Henry Letter 9/14/21, R. 21-3, PageID #273. This letter further accused SOMC of engaging

in "religious-based discrimination" by denying Henry's exemption request, based on the phone call that had occurred earlier that day. *Id*. However, tellingly, Henry again made no reference to a willingness to engage in alternative forms of testing. *Id*. Rather, she argued that her request would not impose a "significant financial burden" on SOMC because "I am not asking for a private office with special air filtration, or any other accommodation that will require financial backing from this business. I am asking to continue with my position's responsibilities and contribution to my team just as I have done from the very beginning of the pandemic." *Id.*

Two days later, Noel informed Henry that SOMC could not provide an exemption from SOMC's weekly testing requirement, but that Henry could be granted a personal leave of absence. Noel Decl. at ¶ 21, R. 21-14, PageID #597; Noel Letter 9/16/21, 21-14, PageID #604.  Henry was put on unpaid leave on September 18, 2021, based on SOMC's belief that she was not willing to submit to any form of COVID-19 testing. *Id.*  Throughout her leave, Henry was eligible for reinstatement if she chose to comply with SOMC's testing requirement. Applegate Decl. at ¶ 34, R. 21-7, PageID #435. In March 2022, SOMC lifted its testing requirement due to changed pandemic conditions, and Applegate informed Henry of her right to reinstatement. *Id.* at ¶ 35. However, Henry refused reinstatement because she had accepted employment elsewhere. *Id.*

## II.    Procedural History

On November 17, 2022, Henry began this litigation by filing her Complaint with the U.S. District Court for the Southern District of Ohio. She alleged four counts therein: (1) failure to accommodate under Title VII; (2) retaliation under Title VII; (3) discrimination under the Americans with Disabilities Act ("ADA")[22]; and (4) retaliation under the ADA. Complaint, R. 1, PageID #1-12. Henry agreed to voluntarily dismiss her ADA claims on February 14, 2024, the eve of the summary judgment deadline. Email 2/14/24, R. 21-6, PageID #429-30. On February 15, 2024, SOMC moved for summary judgment as to Henry's remaining claims. R. 21, PageID #149-50. The district court granted SOMC's Motion for Summary Judgment on September 9, 2024. R. 32, PageID #714-30. Henry filed a Notice of Appeal on October 3, 2024. R. 36, PageID #742.

## SUMMARY OF THE ARGUMENT

As to Henry's failure-to-accommodate claim, Appellant's Brief does not dispute that Henry's request for exemption from all forms of COVID-19 testing would have imposed an undue hardship. Henry's appeal is therefore limited to whether SOMC is liable for failing to offer Henry oropharyngeal, anterior nares, or saliva testing.

---

[22] Henry brought her ADA claims based on the theory that she was "regarded as" disabled based on her unvaccinated status. *See* Complaint at ¶ 2, 54-55, R. 1, PageID #1, 9-10.

Henry's failure-to-accommodate claim fails because she cannot establish a prima facie case. She objected to nasopharyngeal testing, she now claims, because she believed it "could potentially break the blood-brain barrier." But this belief is not supported by evidence, so she cannot establish a conflict between her objection to tests that threaten the blood-brain barrier and SOMC's testing requirement. Moreover, Henry's belief that nasopharyngeal testing is unsafe is not a religious belief, even if Henry also believes that her "body is the temple of the Holy Spirit," and even if this latter belief is religious.

Henry cannot establish a prima facie case for the additional reason that she never informed SOMC of her beliefs in a manner that would have provided SOMC with the opportunity to accommodate her. Rather, she repeatedly stated a blanket objection to all testing, and then claimed in litigation that she would have accepted alternative forms of testing. Her deposition testimony that she made an oral inquiry regarding less invasive forms of testing between her submission of two written requests for exemption from all testing is insufficient to create a genuine issue of material fact. Additionally, Henry's claim fails because her failure to inform SOMC regarding the beliefs she now claims to have held amounts to a failure to participate in good faith in the interactive process.

Further, the district court correctly held that providing saliva testing would have imposed an undue hardship on SOMC. Specifically, the inferior reliability and

increased wait times for results would have endangered SOMC's staff and patients, including newborns in the unit where Henry worked. In addition, SOMC would have had to divert employees from elsewhere to facilitate Henry's hypothetical saliva testing by a third-party vendor, given that SOMC could not offer such testing internally.

Finally, Henry's Title VII retaliation claim fails because she cannot establish that her letter dated September 14, 2021, was the but-for cause of SOMC's decision to place her on unpaid leave given that, by her own admission, the decision had already been made prior to her submission of that letter.

## ARGUMENT

### I.     The district court correctly dismissed Henry's Title VII failure-to-accommodate claim.

"The analysis of any religious accommodation case begins with the question of whether the employee has established a prima facie case of religious discrimination." *Kizer v. St. Jude Children's Rsch. Hosp.* ("*Kizer II*"), No. 24-5207, 2024 WL 4816856, at *2 (6th Cir. Nov. 18, 2024) (citation omitted). To establish a prima facie case, a plaintiff must show that: "(1) [s]he holds a sincere religious belief that conflicts with an employment requirement; (2) [s]he has informed the employer about the conflicts; and (3) [s]he was discharged or disciplined for failing to comply with the conflicting employment requirement." *Id.* (citation omitted). If the plaintiff

establishes a prima facie case, the burden shifts to the defendant "to show that it could not reasonably accommodate the employee without undue hardship." *Id.*

Here, the district court presumed, but did not decide, that Henry had established a prima facie case. R. 32, PageID #718. Proceeding directly to the undue-hardship analysis, the district court correctly held that both accommodations potentially at issue – "self-screening" and saliva testing – would have imposed an undue hardship on SOMC. *Id.* at PageID #726-29. On appeal, Henry challenges only the holding regarding saliva testing and makes no attempt to defend "self-screening." Appellant's Brief at p. 36-40. In addition, Henry argues that oropharyngeal and anterior nares testing should have been considered. *Id.* at p. 25-26. Henry's arguments fail and the district court's decision should be affirmed.

### A. Henry has forfeited her right to appeal the district court's holding that her request to be exempted from all COVID-19 testing would have imposed an undue hardship on SOMC.

The district court correctly held that "Henry's request for an accommodation to be exempt from *both* vaccination *and* testing, no matter the type, poses an obvious threat to her coworkers and to SOMC's vulnerable-by-definition patient population. This, by and of itself, constitutes undue hardship." R. 32 at PageID #726. Henry purports to disagree, insisting that the district court somehow "made a factual error" in taking Henry's own words literally, i.e., in finding that "Henry's objection was to all testing regardless of the type." Appellant's Brief at p. 34. But Appellant's Brief

makes no attempt to argue that Henry could have been exempted from all forms of testing without an undue hardship, thus forfeiting her right to appeal this holding. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief … are waived."). This appeal, then, concerns only SOMC's obligation or lack thereof to offer Henry saliva, oropharyngeal, or anterior nares testing.

**B.    Because she did not hold a sincere religious belief that conflicted with SOMC's COVID-19 testing requirement, Henry failed to establish the first element of a prima facie case of religious discrimination.**

The first element of a prima facie case of a failure-to-accommodate claim under Title VII – that the plaintiff "holds a sincere religious belief that conflicts with an employment requirement" – can be understood as containing three sub-elements regarding the plaintiff's belief at issue: (1) that it is sincerely held; (2) that it is religious in nature; and (3) that conflicts with an employment requirement. Here, Henry cannot establish the religious nature of her belief or that any purportedly religious belief of hers conflicted with SOMC's testing requirement.[23]

---

[23] SOMC reserves the right to dispute the sincerity of Henry's beliefs if this litigation continues.

**1. Henry's purportedly religious beliefs do not conflict with SOMC's requirement to undergo weekly nasopharyngeal testing.**

Given the personal and subjective nature of religious beliefs, courts have exercised some caution in holding that a particular belief is or is not religious as a matter of law. *See, e.g., Bobnar v. AstraZeneca Pharms. LP*, No. 1:22-CV-2258, 2024 WL 4893911, at *16 (N.D. Ohio Nov. 26, 2024) (advising courts to "look to whether the beliefs professed by a [plaintiff] are … , in his own scheme of things, religious.") (citation omitted). However, at the same time, this Court has been clear that determining the existence or non-existence of a conflict between a purportedly religious belief and an employment requirement requires an objective analysis. *See DeVore v. Univ. of Kentucky Bd. of Trustees*, 118 F.4th 839, 846 (6th Cir. 2024) ("The judicial task in assessing evidence of a religious conflict is narrow, but courts must nevertheless ensure … that the belief actually conflicts with a workplace policy."); *see also Ellison v. Inova Health Care Servs.*, 730 F. Supp. 3d 221, 231–32 (E.D. Va. 2024) ("Plaintiffs' argument is essentially that the entire first element—whether they have a 'bona fide religious belief that conflicts with an employment requirement'—turns on their own assessment of their own religious beliefs. That proposition, however, would swallow the second half of the element—the requirement that their religious beliefs 'conflict[ ] with an employment requirement.'") (citation omitted). As such, the mere fact that an employee perceives such a conflict is not dispositive,

or even necessarily relevant, in establishing its actual existence or non-existence. *See DeVore*, 118 F.4th at 846 (holding that plaintiff had failed to establish a conflict between her purported religious beliefs and defendant's COVID-19 testing requirement, despite plaintiff's assertion that a conflict existed).

Here, Henry objected to weekly nasopharyngeal testing on the grounds that "[t]he body is the temple of the Holy Spirit …" Henry Letter 9/3/21, R. 21-3, PageID #263. However, without further elaboration, there is no particular reason why this belief conflicts with a requirement to undergo weekly nasopharyngeal testing. *See Chinnery v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*, No. 1:23CV1110 (DJN), 2024 WL 3152348, at *5 (E.D. Va. June 24, 2024) ("In recent years, the federal courts have been inundated with a deluge of body-as-a-temple claims against mandatory vaccine policies. Cases dismissing these claims are legion. These dismissals crystalize around one unifying theme: a conviction that glorification of self glorifies the Lord, accepted as true, does not plead a conflict with vaccination.") (collecting cases). Henry further elaborated that her religion prohibits her from exposing her body to harmful substances and from undergoing screenings that "could potentially break the blood-brain barrier." Henry Aff. at ¶ 4, R. 25-1, PageID #633. However, **Henry has not introduced even a scintilla of admissible evidence that the nasopharyngeal test required by SOMC contained any harmful substances or posed any risk of breaking the blood-brain barrier.** Rather, Henry

has introduced only her own inadmissible statements to this effect. However, Henry is not an expert witness qualified to opine on such matters. *See* Fed. R. Evid. 702. Accordingly, Henry has failed to establish any genuine issue of material fact as to the existence of a conflict between SOMC's testing requirement and her purported religious beliefs.

*Stynchula v. Inova Health Care Services* is instructive. No. 1:23-CV-01629-MSN-LRV, 2024 WL 4830578, at *11 (E.D. Va. Nov. 19, 2024). In that case, the plaintiff objected to receiving the COVID-19 vaccination on the grounds that "most vaccines are made out of or tested using aborted fetal organs or cells and cell lines." *Id.* However, relying extensively on this Court's reasoning in *DeVore*, the *Stynchula* court held that the plaintiff could not establish a conflict between her religious views and the employer's vaccination mandate in the absence of evidence that the vaccine actually contained or was developed using fetal cells. *Id.* at *13 ("At bottom, [Plaintiff] too did not know if the Novavax vaccine transgressed her fetal cell line beliefs and did not meaningfully research Novavax to understand if it did. … and for this reason, [her] claims must fail for lack of conflict between [her] communicated religious beliefs and Inova's policies."); *see also Ellison*, 730 F. Supp. 3d at 232 ("Because Plaintiffs have failed to establish a genuine dispute as to whether the Novavax vaccine used fetal cell testing in its development, they cannot satisfy the first element of their *prima facie* claim: that their religious beliefs conflicted with

the IPP."). Similarly, here, because Henry cannot establish that her purportedly religious objection to being exposed to harmful substances and risking the breakage of her blood-brain barrier actually conflicted with submitting to nasopharyngeal testing, her failure-to-accommodate claim fails in its entirety and must be dismissed.[24], [25]

### 2.    The beliefs that motivated Henry to object to COVID-19 testing are not religious in nature.

Title VII protects "all aspects of religious observance and practice*." DeVore*, 118 F.4th at 845. A religious belief "need not be acceptable, logical, consistent, or comprehensible to others in order to merit protection, and Title VII is agnostic to the reasonableness of the particular belief or practice in question." *Id.* (citation and

---

[24] Public policy concerns underscore why the assessment of the existence of a religious conflict must be objective, not subjective. Namely, an unsustainable legal status quo would result from a holding that Title VII requires an employer to accommodate an employee's request to avoid anything that she *subjectively* deems "harmful," provided that she has first recited that "my body is a temple for the Holy Spirit." There is, in principle, no reason why this objection could not apply to any given employment requirement that an employee happens to find unpleasant. *See, e.g., Prida v. Option Care Enterprises, Inc*., No. 5:23-CV-00905, 2023 WL 7003402, at *6 (N.D. Ohio Oct. 24, 2023) (declining to confer protection on purportedly religious belief where such belief amounted to "a blanket privilege and a limitless excuse for avoiding all unwanted obligation") (citation omitted); *Ellison*, 730 F. Supp. 3d at 232 ("Plaintiffs' argument, if accepted, would instead permit them to effectively manufacture a conflict with any employment requirement they seek to avoid.").

[25] Henry may assert in response that she stated some purportedly religious objections to COVID-19 testing other than those discussed above, such as that the test constituted "pharmakaia." *See* Henry Letter 9/3/21, R. 21-3, PageID #263. However, even if this belief conflicts with SOMC's testing requirement, it provides no basis on which to distinguish between different types of COVID-19 tests: presumably, all of them are "pharmakaia." Therefore, because Henry has not disputed that SOMC would have faced an undue burden in exempting her from all COVID-19 testing, Henry cannot salvage her claim by citing any purported religious objection that applied to all testing.

internal quotations omitted). Nonetheless, in Title VII's requirement to accommodate employees' religious beliefs, the word "religious" is not superfluous. Indeed, Title VII's coverage attaches only to "practices rooted in 'religious principle,' but not to purely secular beliefs, such as those that are 'essentially political, sociological, or philosophical,' a matter of personal preference, or the product of 'a merely personal moral code.'" *DeVore*, 118 F.4th at 845 (quoting *Welsh v. United States*, 398 U.S. 333, 342–43 (1970) (plurality opinion)). Accordingly, "[t]he judicial task in assessing evidence of a religious conflict is narrow, but courts must nevertheless ensure the asserted conflict is 'sincerely based on a religious belief,' rather than 'some other motivation.'" *Id.* at 846 (quoting *Holt v. Hobbs*, 574 U.S. 352, 360–61, (2015)).

Here, Henry asserts that her "body is a temple of the Holy Spirit" and specifically objects to nasopharyngeal testing on the grounds that such testing could expose her to "harmful substances" and "could potentially break the blood-brain barrier." Henry Aff. at ¶ 4, R. 25-1, PageID #633. But Courts have repeatedly rejected claims in which plaintiffs asserted purportedly religious body-as-temple objections accompanied by plainly medical reasons for opposing COVID-19 vaccination or testing. *See Prida v. Option Care Enterprises, Inc.*, No. 5:23-CV-00905, 2023 WL 7003402, at *6 (N.D. Ohio Oct. 24, 2023); *see also, e.g., McDowell v. Bayhealth Med. Ctr., Inc.*, No. CV 22-1392-RGA, 2024 WL 278187, at *4 (D. Del.

Jan. 25, 2024) (where "Plaintiff's exemption form states that '[her] body is the temple of the Holy Spirit who lives within [her]' and that she believes 'that God wants [her] to protect and purify this body (His temple) not to cause it any harm or contamination,'" dismissing claim because "Plaintiff does not articulate any religious belief that would prevent her from taking the vaccine if she believed it was safe.") (citation omitted), *aff'd,* No. 24-1157, 2024 WL 4799870 (3d Cir. Nov. 15, 2024); *Detwiler v. Mid-Columbia Med. Ctr.*, Case No. 3:22-cv-01306-JR, 2023 WL 7221458, at *6 (D. Or. Sept. 13, 2023) ("[T]he Court readily accepts that plaintiff 'has a bona fide religious belief that her body is a temple of the Holy Spirit'— however, plaintiff's specific determination of what is harmful … was not, in this case, premised on the Bible or any other religious tenet or teaching, but rather on her research-based scientific/medical judgments."), *findings and recommendation adopted*, 2023 WL 7220734 (D. Or. Nov. 2, 2023); *Geerlings v. Tredyffrin/Easttown School District*, Civ. A. No. 21-4024, 2021 WL 4399672 at *7 (E.D. Pa. Sep. 27, 2021) ("Even if I were to accept that [Plaintiff] sincerely believes the body is a temple and should not be harmed, it would be a step too far to count everything she believes about healthy living as a religious practice… [A] 'concern that [a treatment] may do more harm than good[ ] is a medical belief, not a religious one.'") (citation omitted; alterations in original); *Hurley v. Varian Med. Sys.*, No. 23-CV-42, 2024 WL 2368438, at *5 (E.D. Wis. May 23, 2024) ("[T]he oft-recited belief that a

person's body is a temple, *see* 1 Corinthians 6:19-20, does not turn every objection to a Covid vaccine into a religious objection… [I]f a person concludes that the vaccine would violate this belief because he regards the vaccine as unsafe or untested, that is a scientific rather than a religious objection."); *Chinnery*, 2024 WL 3152348, at *5.

The common thread of these holdings is simple: a plaintiff's assertion that she regards her health as a matter of religious significance does not transform every belief that she holds about healthy living into a protected religious belief. Applied here, Henry's assertion that her body is "the temple of the Holy Spirit," even if itself a religious belief, does not thereby extend the protection of Title VII to Henry's beliefs regarding the relative safety of various methods of collecting a culture sample to diagnose COVID-19. Indeed, the above-cited case law suggests that an employee's objection is properly considered religious only where the employee's religious beliefs provide sufficient grounds for the objection, independently of any secular beliefs.

Henry cannot satisfy this test. If Henry were to abandon her religious belief that "my body is the temple of the Holy Spirit," she would still object to submitting to a culture sample collection method that she believes risks breaking her blood-brain barrier. Conversely, if she maintained her body-as-temple belief but changed her views regarding the safety of nasopharyngeal testing, the former belief would no

longer be a basis to object to such testing. Indeed, Henry has alleged no *religious* reason why she objects to nasopharyngeal testing but not to anterior nares testing or oropharyngeal testing. *See Petermann v. Aspirus, Inc.*, No. 22-CV-332-JDP, 2023 WL 2662899, at *2 (W.D. Wis. Mar. 28, 2023) ("The important question isn't whether an employee has a religious belief not to mistreat her body; the question is whether the employee's belief that the vaccine qualifies as mistreatment is itself based in religion."); *Blackwell v. Lehigh Valley Health Network*, No. 5:22-CV-03360-JMG, 2023 WL 5807840, at *9 (E.D. Pa. Sept. 7, 2023) ("…beliefs challenging the factual and scientific basis for imposing the [COVID-19] testing requirement … [are] not religious."). Accordingly, the beliefs that motivated Henry's objection to nasopharyngeal testing were not religious in nature.

This Court's recent holdings in *Lucky v. Landmark Med. of Michigan, P.C.*, 103 F.4th 124 (6th Cir. 2024) and *Sturgill v. Am. Red Cross*, 114 F.4th 803 (6th Cir. 2024) do not mandate a different result. Both cases held that a plaintiff's body-as-temple objection to COVID-19 vaccination constituted a facially religious belief sufficient to survive a 12(b)(6) motion to dismiss. *Lucky*, 103 F.4th at 1243-44; *Sturgill*, 114 F.4th at 810. But neither dealt with the present summary-judgment context. Furthermore, *Sturgill*'s relevant pronouncement – that the existence of "both religious and secular reasons for an act does not elevate the latter over the former, especially at the pleading stage" – harmonizes with the requirement that an

employee's religious beliefs provide sufficient grounds for the objection at issue, independently of any secular beliefs. *Sturgill*, 114 F.4th at 810 (citing *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 901 (8th Cir. 2024); *Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir. 1981)). As explained in *Callahan v. Woods*, cited by *Sturgill* as authority for its rule, "The devout Seventh-Day Adventist may enjoy his Saturday leisure; the Orthodox Jew or Mohammedan may dislike the taste of pork. Such personal considerations are irrelevant to an analysis of the claimants' free exercise rights, so long as their religious motivation requires them to keep the Sabbath and avoid pork products." 658 F.2d at 684. In these examples, the hypothetical religious objector has a sufficient religious reason for his objection, independently of any secular motivation that may also exist. But here, Henry's religious beliefs do not provide sufficient grounds for her objection to nasopharyngeal testing independently of her secular belief that it is unsafe. Accordingly, while body-as-temple beliefs may be sufficient to survive a motion to dismiss, they cannot survive summary judgment where, as here, the plaintiff has articulated only medical or scientific reasons why she understands her body-as-temple belief to conflict with her employer's requirement.[26]

---

[26] To the extent that Henry may assert in response that she stated some purportedly religious objections to COVID-19 testing other than those discussed above, the rebuttal elaborated in footnote 25 *supra* applies.

**C.    Because she did not adequately inform SOMC of the conflict between her alleged beliefs and the COVID-19 testing requirement, Henry failed to establish the second element of a prima facie case of religious discrimination.**

The second element of a prima facie case of a failure-to-accommodate claim under Title VII requires that a plaintiff "has informed the employer about the conflicts" between her sincere religious belief and an employment requirement. *Kizer II*, 2024 WL 4816856, at *2. Most often, an employee fails to satisfy this element where she provides no notice of her alleged need for a religious accommodation at all, s*ee Jiglov v. Hotel Peabody*, G.P., 719 F. Supp. 2d 918, 930–31 (W.D. Tenn. 2010), which is not the case here. However, the second element must be interpreted based on its purpose. Specifically, "[p]ublic policy requires that an employer be informed of the alleged conflict and be given the opportunity to make an accommodation before being subjected to liability for religious discrimination." *Averett v. Honda of Am. Mfg., Inc.*, No. 2:07-CV-1167, 2010 WL 522826, at *10 (S.D. Ohio Feb. 9, 2010).

Notably, the first prima facie element of a failure-to-accommodate claim under Title VII – that the employee "has a sincere religious belief that conflicts with an employment requirement" – is satisfied or not based on the employee's *private* belief. *Kizer II*, 2024 WL 4816856, at *2. The third element, in essence, is that the employer did not accommodate that private belief. *Id.* As such, the second element must consist of adequate notice of the employee's belief to provide the employer

with an opportunity to make an accommodation. *See E.E.O.C. v. Univ. of Detroit*, 904 F.2d 331, 335 (6th Cir. 1990) ("The duty to accommodate cannot be defined without reference to the specific religious belief at issue."); *Jiglov*, 719 F. Supp. 2d at 931 ("…the law does not require that a[n] employer divine the existence of a conflict…"). Such notice has not occurred where an employee expresses one set of beliefs during her employment, which undisputably could not have been accommodated, and then alleges different beliefs during litigation – which contradict her beliefs as expressed during her employment. *See Blackwell*, 2023 WL 5807840, at *9 ("… because … Plaintiff failed to inform Defendant of these beliefs, these beliefs cannot form the basis of her religious discrimination claim."). Henry has done exactly that.

On September 3, 2021, Henry submitted a detailed, four-page letter to SOMC expressing a blanket objection to all COVID-19 testing and making no distinction between different types of tests. Henry Letter 9/3/21, R. 21-3, PageID #263-66. In addition, the specific grounds stated in the letter plainly contradict the proposition that any form of COVID-19 testing would have been acceptable to Henry:

| Henry's Own Words | Reasons Stated for Objection | Forms of Testing to Which Objection Applies |
|---|---|---|
| "My sincerely-held Christian beliefs DO NOT ALLOW ME to: … be assaulted by a foreign body being inserted into my nasal passages (i.e., covid test) as my | The test involves insertion of a swab. | Nasopharyngeal, oropharyngeal, anterior nares |
| | The test involves insertion of a swab | Nasopharyngeal, anterior nares |

| | | |
|---|---|---|
| body is the temple of the Holy Spirit and is to remain pure." *Id.* at PageID #263. | into the nasal passage specifically. | |
| "COVID VACCINES and COVID TESTS: The body is the temple of the Holy Spirit and as such, should not be used for medical treatments that are unnecessary, and abhorrent. Substances in the test and the vaccine are possibly harmful to the human body, and we are called to protect the body and not participate in pharmakaia." *Id.* | The test is not medically necessary. | Nasopharyngeal, oropharyngeal, anterior nares, saliva |
| | The test contains harmful substances. | Nasopharyngeal, oropharyngeal, anterior nares[27] |
| | The test is a form of "pharmakaia." | Nasopharyngeal, oropharyngeal, anterior nares, saliva |
| "Further, participating in a medical experiment, such as covid testing or vaccines, is also a violation of my religious beliefs. Covid tests have an emergency authorization by the FDA, not an approval." *Id.* at PageID #264. | The test is a form of medical experiment. | Oropharyngeal, anterior nares, saliva |

Accordingly, based on Henry's religious exemption letter, SOMC reasonably interpreted her objection to apply to all forms of COVID-19 testing. Blankenship Decl. at ¶¶ 31-33, R. 21-3, PageID #256.

When Henry spoke with Teresa Bryan four days after submitting her letter, Henry requested only one accommodation: to "self-screen." Bryan Decl. at ¶ 8, R. 21-13, PageID #593. Henry did not state that she was willing to take other forms of COVID-19 test and, in fact, explicitly stated that her religious objection applied to

---

[27] While none of these actually contained harmful substances, Henry's objection would apply to all swab-based tests given her assumption that the swabs contained harmful substances.

throat swabs (i.e., oropharyngeal testing). Bryan Presentation, R. 21-13, PageID #594; Henry Dep. at 48:9-14, R. 21-4, PageID #321. This conversation harmonized with SOMC's prior understanding of Henry's objection as applying to all COVID-19 testing.

Henry subsequently submitted her letter dated September 14, 2021, which again made no distinction between different types of tests. Henry Letter 9/14/21, R. 21-3, PageID #273. This letter also reiterated that her requested accommodation was simply to continue in her position without testing. *Id.* Based on these communications, SOMC cannot justly be found liable for failing to offer Henry oropharyngeal, anterior nares, or saliva testing, as such forms of testing plainly conflicted with the objection to all COVID-19 testing expressed by Henry.

### 1.    Henry's testimony that she inquired about less invasive forms of testing does not create a genuine issue of material fact.

Between her September 7, 2021, conversation with Bryan and her submission of the letter dated September 14, 2021, Henry had a phone call with Ken Applegate and Sara Blankenship. Blankenship Decl. at ¶ 43, R. 21-3, PageID #257. Henry now contends that her deposition testimony regarding that call creates a genuine issue of material fact. Appellant's Brief at p. 34-36. Specifically, she contends that an alleged inquiry during that call was sufficient notice to trigger an obligation for SOMC to offer her saliva, oropharyngeal, and/or nasopharyngeal testing – even though these

conflicted with her religious beliefs as she expressed them on every occasion during

her employment, both before and after that call. The relevant testimony is as follows:

> Q. Okay. Did you say anything during that conversation?
>
> A. I just stated I was not going to agree to weekly testing, that form of weekly testing, and asked if there was any other forms of testing that was acceptable. And he said no, there's not. I had to do that specific one.
>
> Q. Did you have any other types of testing that you suggested or recommended, or did you just ask if they had other ones?
>
> A. I asked if there was something – any other types that was less invasive. I was willing to spit in a – like, there's a type that you can spit in a cup.
>
> Q. Did you talk about that with Mr. Applegate, or is that just something you knew of?
>
> A. That was something I knew of. I don't remember if I did ask them or not.
>
> Q. Okay. Whether or not there were other forms of testing?
>
> A. Correct.

Henry Dep. at 52:22-53:15, R. 21-4, PageID #325-26.

The above testimony is the entire evidentiary basis for Henry's assertion that

SOMC was obligated to accommodate *not* the beliefs that she expressed in her three

written requests for accommodation (i.e., blanket opposition to all COVID-19

testing) and her conversation with Teresa Bryan (i.e., blanket opposition to all

COVID-19 testing and specific opposition to oropharyngeal testing) but rather the

belief that she expressed in the affidavit that she filed in opposition to SOMC's

Motion for Summary Judgment (i.e., opposition to nasopharyngeal testing only). Such evidence is insufficient.

The central issue at the summary judgment stage is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Here, the evidence meets the requisite degree of one-sidedness to entitle SOMC to summary judgment. During her deposition, Henry first testified that she had asked about other forms of testing, but then, upon follow-up questioning, clarified that she could not remember whether she had or not. Henry Dep. at 53:9-15, R. 21-4, PageID #326. As such, the district court correctly viewed Henry's affidavit stating with certainty that she had asked about other forms of testing as sham. R. 32 at PageID #725 ("So, in her deposition, Henry couldn't remember if she had asked about 'other forms' of testing, yet eight months later, she was sure that she did… Henry's affidavit plainly contradicts her deposition testimony.") (citing *Reich v. City of Elizabethtown*, 945 F.3d 968, 976 (6th Cir. 2019) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."). Henry has failed to prove that this finding was an abuse of discretion. *See Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 842 (6th Cir. 2021) ("[W]e normally review the [sham affidavit] rule's use for an abuse of

38

discretion."). Moreover, both Applegate and Blankenship deny that Henry ever asked about alternative forms of testing. Blankenship Decl. at ¶ 46, R. 21-3, PageID #258; Applegate Decl. at ¶ 26, R. 21-7, PageID #434. Accordingly, Henry's evidence is insufficient to create a genuine issue of material fact.

Finally, even if Henry's evidence was sufficient to show, for summary judgment purposes, that she had inquired regarding less invasive testing during the phone call on September 14, 2021, the fate of Henry's claim would be unchanged. Indeed, even if Henry had "asked if there was … any other types [of test] that was *less invasive*," Henry Dep. at 53:6-7 (emphasis added), R. 21-4, PageID #326, there is no reason why SOMC would have interpreted this question to indicate a willingness to submit to oropharyngeal or anterior nares testing – both of which also involve the insertion of a swab, and both of which Henry had specifically objected to only days earlier. *See* Bryan Presentation, R. 21-13, PageID #594 ("When I prompted her on strep throat swabs, etc. She denied she would allow this."); Henry Letter 9/3/21, R. 21-3, PageID #263 (objecting to "a foreign body being inserted into my nasal passages"). Indeed, without Henry's affirmatively stating that her true beliefs were not as she had expressed them in her prior written requests and her conversation with Bryan, SOMC would have been reasonable in interpreting any hypothetical inquiry by Henry as an inquiry regarding alternative forms of testing that did not conflict with her avowed religious beliefs – and there was no such form

of testing available. Accordingly, Henry cannot satisfy the second element of a prima facie case because she never provided notice to SOMC that, despite her repeated statements to the contrary, her alleged religious beliefs did not actually preclude all forms of testing.

### D.    Additionally, Henry's claim fails because she failed to participate in good faith in the interactive process.

As this Court recently observed, there is "no legal authority that would require employers considering Title VII accommodations (rather than accommodations under the Americans with Disabilities Act (ADA) ) to engage in … a[n] [interactive] process." *Kizer II*, 2024 WL 4816856, at *3. Accordingly, SOMC would have been within its rights to simply deny Henry's testing accommodation outright based on her letter's facial objection to all COVID-19 testing, which could not be accommodated. Instead, SOMC engaged Henry in conversation to clarify the nature of her objection, convened its Ethics Committee to discuss her request as stated, and ultimately informed Henry that she would be placed on leave if she was unwilling to submit to weekly testing. *See* Factual Background *supra.* Henry now alleges that her true objection was not to all COVID-19 testing but only to nasopharyngeal testing. Appellant's Brief at p. 34-36. But Henry should not be permitted to advance this claim due to her failure to participate in the interactive process in good faith.

Although an interactive process is not required under Title VII, common sense dictates that where an employer has voluntarily engaged in one, "both parties have

a duty to participate in good faith," as under the ADA. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007). Thus, in the ADA context, "when the employer engages with an employee who refuses to participate in good faith or withholds essential information, the employer cannot be liable under the ADA for failure to accommodate." *Kovac v. Superior Dairy, Inc.*, 998 F. Supp. 2d 609, 619–20 (N.D. Ohio 2014). The present case demonstrates that these rules are essential in the Title VII context as well.

Here, in her three letters and verbal conversation with Teresa Bryan, Henry asserted a blanket objection to all testing. *See* Henry Letter 9/3/21, R. 21-3, PageID #263-66; Hall Letter in Support of Henry, R. 21-3, PageID #271-72; Henry Letter 9/14/21, R. 21-3, PageID #273; Bryan Presentation, R. 21-13, PageID #594. Further, throughout the entire accommodations process, Henry never specifically requested any accommodation other than self-screening, even though she was aware of saliva testing and had received and reviewed SOMC's email putting her on notice of oropharyngeal testing. Henry Dep. at 20:18-25, 52:22-53:15, R. 21-4, PageID #293, 325-26. In addition, Henry had informed SOMC that she would be unwilling to comply with *any* weekly testing requirement for secular reasons: namely, she believed that any COVID-19 mitigation protocols that "single[] me out as unvaccinated" would constitute "harassment, intimidation, undue influence, coercion, and defamation." Henry Letter 9/3/21, R. 21-3, PageID #265-66.

But Henry now asserts that, at all times, she was supposedly willing to accept weekly oropharyngeal, anterior nares, or saliva testing as an accommodation – even though she withheld this essential information from SOMC during her employment and, in fact, repeatedly stated the opposite. *See* Henry Aff. at ¶ 9, R. 25-1, PageID #634. Indeed, the stark contrast between Henry's repeated expression of blanket opposition to all COVID-19 testing and her latest affidavit stating that her true objection was limited to the depth of the swap insertion during nasopharyngeal testing demonstrates that she failed to honestly communicate with SOMC, both during the interactive process and in litigation. This lack of good faith is fatal to her claim. *See Kovac,* 998 F. Supp. 2d at 619–20.

Henry cites *Groff v. DeJoy* to support her argument that SOMC failed to adequately explore alternative forms of testing. Appellant's Brief at p. 26 (citing 600 U.S. 447, 473 (2023) ("Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations.")). But plainly, *Groff* creates no requirement for an employer to offer accommodations that conflict with the religious beliefs that an employee has repeatedly expressed. Moreover, this Court has made clear post-*Groff* that an employer is not liable for failing to consider accommodations that an employee proposes for the first time during litigation, provided that the employer "made a reasonably informed and considered decision"

in determining that the employee could not be accommodated during her employment. *Kizer II*, 2024 WL 4816856, at \*4 (rejecting plaintiff's argument that employer was "required to present evidence that it considered various alternative accommodations proposed by [Plaintiff] after the fact" and stating that "we do not require that the decisional process used by the employer be optimal or that it left no stone unturned.") (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). Here, SOMC acted reasonably based on Henry's requests during her employment, and Henry's claim cannot be salvaged based on accommodations that she has proposed for the first time in litigation.

### E.    The district court correctly held that SOMC would have faced an undue hardship in offering Henry saliva testing.

For the reasons stated *supra*, this Court need not reach whether saliva testing would have imposed an undue hardship on SOMC. However, in any event, SOMC satisfied its burden of proving this affirmative defense. To demonstrate an undue hardship under Title VII, an employer must show "substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470. Notably, however, "Title VII does not require that safety be subordinated to the religious beliefs of an employee." *Savel v. MetroHealth Sys.*, No. 1:22-CV-02154, 2024 WL 4581542, at \*11 (N.D. Ohio Oct. 25, 2024) (quoting *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1975)). Thus, "[a] court is permitted assess an employer's defense of undue hardship as a matter of law where the proposed

43

accommodation would either cause or increase safety risks or the risk of legal liability." *Id.* (citation omitted). Further, "[i]n determining whether an accommodation would pose an undue hardship, an employer is permitted to draw conclusions based on evidence and information that was available at the time." R. 32, PageID #719 (quoting *MacDonald v. Oregon Health & Science Univ.,* No. 3:22-cv-01942-IM, 2024 WL 3316199, at *7 (D. Or. July 5, 2024), *appeal docketed*, No. 24-4852 (9th Cir. Aug. 8, 2024)).

Here, the district court presumed, but did not decide, that Henry had requested a saliva test in lieu of a nasopharyngeal test[28] and held that SOMC had met its burden of demonstrating undue hardship with respect to this potential accommodation. R. 32, PageID #727-29. To reach this conclusion, the district court considered the additional time that would have been required to send Henry's hypothetical saliva test to a third-party test provider, holding that "[m]ore than doubling the time it takes to learn whether a patient-facing employee is positive for the virus unmistakably compromises SOMC's mission to 'serve the community and keep it safe.' … Thus, accommodating Henry a second time by allowing her to instead take a saliva test constitutes an undue burden." *Id.* at PageID #729. The district court also quoted at length the declaration of SOMC's clinical microbiologist Dr. Timothy Cassity ("Dr.

---

[28] As discussed in Parts I(C) and I(D) *supra*, SOMC denies that Henry requested a saliva test or otherwise triggered any obligation for SOMC to offer saliva testing.

Cassity"), which contained additional reasons why saliva testing would have imposed an undue hardship, including that such testing was believed to be less effective. *Id.* at PageID #727-29 (quoting Cassity Decl., R. 21-10 at ¶¶ 3-5, 8-16, 18).

On appeal, Henry does not argue that SOMC could have validated an in-house saliva test without undue hardship. Nor does Henry cite evidence to dispute that saliva testing was, or was considered, less effective at detecting COVID-19. Rather, Henry challenges SOMC's evidence that third-party testing would have taken at least 48 hours and further challenges the district court's reasoning in concluding that providing third-party testing for Henry would have imposed an undue hardship. But Henry's arguments fail.

> **1.    The scope of this Court's review is limited because Henry did not respond to SOMC's argument that saliva testing would impose an undue hardship in her Opposition to SOMC's Motion for Summary Judgment.**

As a preliminary matter, SOMC notes that Henry's Opposition to SOMC's Motion for Summary Judgment did not address SOMC's argument that saliva testing would impose an undue hardship. *See* R. 25, PageID #613-32. Rather, Henry's Opposition moved the target to instead argue that Henry should have been offered oropharyngeal or anterior nares testing. *Id.* at PageID #619-20. As such, Henry's appeal as to the hardship posed by saliva testing is brought contrary to interests of judicial efficiency. *See Sheet Metal Workers' Health & Welfare Fund of N. Carolina*

*v. L. Off. of Michael A. DeMayo, LLP*, 21 F.4th 350, 355 (6th Cir. 2021) ("Before a party may present an issue for our review, we customarily require the party to raise the issue in the district court … so that both the parties and this Court have the benefit of the district court's assessment of the issue when the case is taken up on appeal. … This practice also conserves the judiciary's time and resources by not requiring lower courts—who have burdensome dockets already—to re-adjudicate matters that should have been raised earlier.").

SOMC contends that, for this reason, the district court's holding on this issue should not be reviewed at all. Still, caselaw indicates that "[a] non-movant who does not respond to a motion for summary judgment … may still attack the district court's reasoning, arguing that the party moving for summary judgment failed to carry its burden," although the non-movant "cannot point to new facts on appeal." *Loc. No. 499, Bd. of Trustees of Shopmen's Pension Plan v. Art Iron, Inc.*, 117 F.4th 923, 934 (6th Cir. 2024). Accordingly, this Court's review of the district court's grant of summary judgment as to the undue hardship posed by saliva testing, if any, is limited to whether SOMC met its initial burden.

### 2. SOMC would have faced an undue hardship in offering Henry saliva testing.

SOMC met its summary-judgment burden of proving an undue hardship as to saliva testing. All events at issue in this case occurred during a once-in-a-century pandemic and after SOMC had determined that COVID-19 was being transmitted

by staff at its hospital. Blankenship Decl. at ¶¶ 14-15, R. 21-3, PageID #254. During

this public health emergency, Henry worked as a nurse in SOMC's pediatric unit,

where she provided care for vulnerable newborns. Id. at ¶ 29, PageID #255; Henry

Dep. at 16:13-16, R. 21-4, PageID #289. Under such circumstances, SOMC's

judgment as to how to protect its patients and staff is entitled to substantial deference.

As one court explained:

> As a major hospital and healthcare system, [Defendant] is
> unquestionably entitled to rely on its own medical and scientific
> judgment in matters of patient health and safety, and to adopt strict
> infection-control policies to protect its patient and staff populations.
> And it has a strong interest in maintaining public confidence in the
> safety of its facilities.
>
> It is also true that substantial deference must be given to the judgments
> of a hospital organization struggling to cope with a worldwide
> pandemic. And it is emphatically not the role of the federal courts
> simply to second-guess those judgments, or to substitute its own views
> for those of trained medical personnel.
>
> In short, [Defendant] was entitled to make a medical and scientific
> judgment. … It was not required to permit its staff to take unnecessary
> risks with patient health and safety. Nor was it required to accommodate
> irrational fears or conspiracy theories.

*Adams v. Mass Gen. Brigham, Inc.*, No. 21-11686-FDS, 2023 WL 6318821, at *1

(D. Mass. Sept. 28, 2023). As such, courts have repeatedly held that the risks created

by exempting employees from COVID-19 mitigation protocols amounted to undue

hardship. *See, e.g., Wise v. Children's Hosp. Med. Ctr. of Akron,* No. 5:22-CV-02092,

2024 WL 3345494, at *2 (N.D. Ohio July 9, 2024) (granting summary judgment to

defendant hospital because allowing plaintiff to come to work "while remaining unvaccinated and untested creates a heightened health risk that constitutes an undue hardship.") (collecting cases); *Kizer II*, 2024 WL 4816856, at *6; *Savel*, 2024 WL 4581542, at *13.

Here, offering Henry saliva testing would have unacceptably increased the risk of COVID-19 infection for SOMC's patients and staff. First, saliva testing was believed to be a less effective method of detecting COVID-19 infection than other forms of testing available at the time – per the guidance of the CDC, SOMC's own medical experts, and a published study. Cassity Decl. at ¶¶ 8-10, R. 21-10, PageID #461-62. Henry has introduced no evidence to dispute that saliva testing was considered less effective than other forms of testing. Second, the use of saliva testing would have doubled (or more) the time for SOMC to learn whether Henry was positive for COVID-19, adding at least a full workday each week when Henry could have been unknowingly exposing SOMC's patients and staff to the virus. Proffit Decl. at ¶¶ 6-8, R. 21-9, PageID #458-59. Henry challenges this second proposition, but her arguments fail.

Henry does not dispute that SOMC lacked the capacity to perform saliva testing in-house and would have been required to engage a third-party vendor. However, she challenges the sufficiency of SOMC's evidence that obtaining the results of Henry's hypothetical saliva test from the hypothetical third-party vendor

48

would take at least 48 hours. Appellant's Brief at p. 39. SOMC supported this fact with the declaration of Brad Profitt, SOMC's Administrative Director of the Lab, who stated that when utilizing third-party testing vendors earlier in the pandemic, SOMC had to wait three to seven days for results. Proffit Decl. at ¶ 6, R. 21-9, PageID #458. Profitt also stated, based on his knowledge as administrator of SOMC's lab, that "there would be at least one day required in getting the specimen to the lab and at least a day's time, if not longer, in the lab conducting the analysis and reporting its findings to SOMC." *Id.* at ¶ 8, PageID #459. Profitt was competent to testify to these facts, and Henry has introduced no evidence that saliva test results for Henry could have been obtained in less than 48 hours. Clearly, then, Henry has not met her obligation to present "significant probative evidence that establishes more than some metaphysical doubt as to the material facts." *Golden v. Mirabile Inv. Corp.*, 724 F. App'x 441, 445 (6th Cir. 2018) (citation and internal quotations omitted).

The use of a third-party vendor for saliva testing would have imposed additional burdens besides increased risk of COVID-19 transmission by Henry. Specifically, the third-party vendors with which SOMC had business relationships did not offer saliva testing, and SOMC was not aware of any third-party vendor that did offer this service. Cassity Decl. at ¶ 4, R. 21-10, PageID #461; Cassity Dep. at 36:7-10, R. 25-2, PageID #671. Accordingly, SOMC would have had to identify and

engage a vendor that offered this service and arrange for the shipping, administration, and results tracking of Henry's hypothetical saliva tests. Further, SOMC would have had to assign other employees to perform these tasks, which is a significant burden in itself. *See Kizer v. St. Jude Children's Rsch. Hosp., Inc.* ("*Kizer I*"), No. 2:22-CV-02620-TLP-CGC, 2024 WL 4834056, at *9 (W.D. Tenn. Feb. 9, 2024) (where employee suggested that other employees be diverted to implement her accommodation to COVID-19 vaccination, holding that "a religious accommodation that requires other employees to take on additional duties or change their schedules, especially in this context, presents an undue hardship.") (citation and internal quotations omitted), *aff'd sub nom. Kizer II*, 2024 WL 4816856. And, notably, Henry has introduced no evidence that a vendor offering saliva testing services even existed in the area at the time.

Henry further attacks SOMC's undue-hardship defense as "speculation" because "SOMC never tried to accommodate Ms. Henry with an off-site saliva test." Appellant's Brief at p. 36-38. However, "the possibility of an unvaccinated individual getting others sick is a 'non-speculative risk that a court may consider' in assessing whether an accommodation would have been an undue hardship." *Kizer I*, 2024 WL 4834056, at *12 (collecting cases); *see also Wise*, 2024 WL 3345494, at *3 (disagreeing with Plaintiff's apparent contention that "because the heightened

risks relied upon by the Hospital did not actually materialize that the risks simply do not exist.").[29]

Finally, Henry argues that utilizing a third-party testing provider could not have constituted an undue burden because SOMC did this for all its employees prior to validating in-house its testing capabilities. Appellant's Brief at p. 40. But, given that Henry did not oppose SOMC's motion for summary judgment as to its undue-hardship defense on saliva testing, Henry "cannot point to new facts on appeal," *Loc. No. 499*, 117 F.4th at 934, including this one. Moreover, even if the Court did consider that SOMC utilized third-party vendors before validating its in-house testing capability, it does not follow that it could have continued to do so for Henry alone without undue hardship. *See Kizer II*, 2024 WL 4816856, at *6 (finding undue hardship where "St. Jude's evidence also showed that retaining its pre-vaccine COVID control measures for unvaccinated employees … would be costly in both time and money."); *Brokken v. Hennepin Cnty.*, No. CV 23-1469 (JRT/DJF), 2024 WL 1382150, at *6 (D. Minn. Mar. 29, 2024) ("Brokken's first argument that because Hennepin County had previously allowed her to work fully remotely means it could not possibly present an undue hardship is unfounded."). Indeed, a finding of

---

[29] The six out-of-jurisdiction cases cited in Appellant's Brief (at pp. 46-49) are distinguishable on multiple grounds, including that none addressed an employee's objection to COVID-19 testing or any form thereof; all dealt with objections to COVID-19 vaccination, but SOMC accommodated Henry's objection to vaccination.

undue hardship based on safety concerns is necessarily dependent on the possibilities for risk mitigation existing at the time of the assessment. Before the availability of the COVID-19 vaccination, no employer faced an undue hardship by allowing employees to work unvaccinated. After the vaccine's availability, the continuation of the status quo pre-vaccination became, in many cases, an undue hardship – precisely because it became possible to mitigate risks through vaccination. *See, e.g., Wise*, 2024 WL 3345494, at *2 (collecting cases). Similarly, here, although SOMC utilized third-party testing vendors and waited three days or more for results before it validated its in-house testing capability, it nonetheless would have imposed an undue hardship to continue to use third-party vendors after SOMC had developed such capability – again, largely because it became possible to further mitigate the risks through a faster testing process.

At bottom, then, SOMC's undue-hardship defense comes down to this: Henry cannot reasonably dispute that allowing her to submit to saliva testing would have increased the risk of COVID-19 infection to SOMC's patients, including newborns. Henry can only argue about the magnitude of that increased risk. For its part, SOMC judged the risk associated with adding a full workday each week when Henry could have been unknowingly exposing newborns to COVID-19 to be unacceptably high. This judgment was reasonable and should not be second-guessed, particularly given the pandemic conditions that obtained in 2021. Accordingly, SOMC is entitled to

summary judgment on its affirmative defense that it could not have offered Henry saliva testing without an undue hardship.

## II.     The district court correctly dismissed Henry's Title VII retaliation claim.

To prevail in her Title VII retaliation claim, Henry must ultimately prove that her "protected activity was a *but-for cause* of the alleged adverse action by the employer," *Laughlin v. City of Cleveland*, 633 F. App'x 312, 315 (6th Cir. 2015) (emphasis added) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).

Henry's appeal does not challenge the district court's holding that SOMC's placing Henry on unpaid leave cannot serve as both the denial of her accommodation and retaliation for her having requested the accommodation in the first instance. *See* R. 32 at PageID #729. Nor does Henry challenge the district court's holding that Henry's accommodation letter dated September 3, 2021, cannot constitute preemptive opposition to its own future denial. *Id.* at PageID #730. Rather, Henry shifts her focus to a different protected activity: "the district court ignores the fact that Ms. Henry's September 14, 2021 letter was sent after her call with Mr. Applegate and Ms. Blankenship, when she believed that her accommodation request would be denied." Appellant's Brief at p. 52-53. Henry continues, "This letter … was opposition to what Ms. Henry perceived as a violation of the law after that violation occurred, specifically citing Title VII of the Civil Rights Act." *Id.* at p. 53.

In other words, Henry now alleges that her placement on unpaid leave was retaliation for a letter that she wrote *after* she had already been told that she would be placed on unpaid leave if she did not agree to COVID-19 testing. Plainly, Henry cannot establish that her September 14, 2021 letter was the but-for cause of a decision that had already been made before she submitted that letter. *See Williams v. William Beaumont Hosp.*, 2007 WL 4455023, at *5 (E.D. Mich. 2007) (finding no causal connection when plaintiff engaged in protected activity after supervisor had already decided to fire her); *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) ("[an employer] proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.") (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)). Accordingly, Henry's retaliation claim fails.

## CONCLUSION

For these reasons, this Court should affirm the district court's Order granting Appellee Southern Ohio Medical Center's Motion for Summary Judgment and dismissing Christina Henry's Complaint.

Respectfully submitted,

*/s/ S. Mark Klyza*
S. Mark Klyza (OH Bar #27186)
Benjamin Landau-Beispiel (La. Bar No. 40426)
**THE KULLMAN FIRM, P.L.C.**
1100 Poydras Street, Suite 1600

New Orleans, LA 70163
Telephone: (504) 524-4162
Facsimile: (504) 596-4114
E-mail: smk@kullmanlaw.com
E-mail: blb@kullmanlaw.com

*Attorneys for Defendant-Appellee*
*Southern Ohio Medical Center*

## CERTIFICATE OF COMPLIANCE

Counsel for Defendant-Appellees hereby certify that the foregoing brief complies with the type-volume limitation provided in Federal Rule of Appellate Procedure 32(a)(7)(B) and Sixth Circuit Rule 32(b) because it contains 12,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Sixth Circuit Rule 32(b)(1), as counted using the word-count function on Microsoft Word 2021 software.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2021, in Times New Roman style, 14 point font.

*/s/ S. Mark Klyza*
S. Mark Klyza (OH Bar #27186)

*Attorneys for Defendant-Appellee*
*Southern Ohio Medical Center*

## CERTIFICATE OF SERVICE

In compliance with Federal Rule of Appellate Procedure 25(c) and Sixth Circuit Rule 25(f)(1), I hereby certify that on this 12th day of February 2025, I electronically filed with the Clerk's Office of the United States Court of Appeal for the Sixth Circuit this Brief of Defendant-Appellee, and further certify that opposing counsel will be notified of this filing through the Notice of Docket Activity generated by this electronic filing.

*/s/ S. Mark Klyza*
S. Mark Klyza (OH Bar #27186)

*Attorneys for Defendant-Appellee*
*Southern Ohio Medical Center*

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rules 28(b)(1)(A)(i) and 30(g)(1), Appellee designates the following docket entries from Docket No. 1:22-cv-00679 in the United States District Court for the Southern District of Ohio:

| Record Entry No. | Document | PageID# |
|---|---|---|
| 1 | Complaint | 1-12 |
| 13-1 | Defendant's Memorandum in Support of Its Motion to Exclude Plaintiff's Expert Witness, Dr. Heinz J. Huber, PhD. | 56-67 |
| 13-3 | Plaintiff's Rebuttal Expert Witness Designation | 77-79 |
| 21 | Defendant's Motion for Summary Judgment | 149-150 |
| 21-1 | Defendant's Memorandum in Support of Its Motion for Summary Judgment | 152-188 |
| 21-3 | Declaration of Sara Blankenship | 252-273 |
| 21-4 | Deposition Transcript of Christina Henry | 289, 293, 298, 320-322, 325-326 |
| 21-6 | Email 2/14/24 | 429-430 |
| 21-7 | Declaration of Ken Applegate | 431-436 |
| 21-8 | Declaration of Dr. David Byers | 441-444 |
| 21-9 | Declaration of Brad Profitt | 458-459 |
| 21-10 | Declaration of Dr. Timothy Cassity, PhD. | 460-476 |
| 21-11 | Deposition Transcript of Sara Blankenship | 486 |
| 21-12 | Deposition Transcript of Teresa Bryan | 568-569 |
| 21-13 | Declaration of Teresa Bryan | 592-594 |
| 21-14 | Declaration of Vicki Noel | 595-604 |
| 24 | Order | 610-612 |
| 25 | Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment | 613-632 |
| 25-1 | Declaration of Christina Henry | 633-635 |
| 25-2 | Deposition Transcript of Dr. Timothy Cassity, PhD. | 671 |
| 26 | Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment | 678-694 |

| Record Entry No. | Document | PageID# |
|---|---|---|
| 26-1 | Declaration of Sara Blankenship | 696-698 |
| 26-2 | Noel Email 8/16/21 | 699 |
| 32 | Order and Opinion | 714-730 |
| 36 | Notice of Appeal | 742 |